No. 13.—Doe *ex dem.* SAMUEL GLADNEY and another, administrators, &c. plaintiffs in error, *vs.* ISAAC B. DEAVORS.

[1.] Tax Collectors have power in this State, to issue execution against defaulting tax payers, for the collection of taxes—which the Constables and Sheriffs are bound to execute and return.

[2.] A return made by a Constable, of "no personal property to be found," is admissible to prove that fact, when made by him on a Tax Collector's execution. Proof of that fact cannot be made by parol. There must be an official return of it.

[3.] The State is bound by public laws, for the promotion of learning, the advancement of religion and the support of the poor, although not expressly named.

[4.] The State is bound by the Acts of the Legislature, exempting certain articles of property from levy and sale for debts, for the benefit of the wife and children of the debtor; and such property cannot be seized and sold under execution, to pay the taxes due by him.

Ejectment, in Sumter Superior Court. Tried before Judge WARREN, November Term, 1851.

This action was brought by the lessee of Gladney and another, administrators of Godwin, against Isaac B. Deavors. On

the trial, plaintiffs offered in evidence a Tax Collector's deed, and at the same time, a Tax Collector's *fi. fa.* against John Deupree, for the tax for the year 1841, issued September, 1841, and levied by the Tax Collector, October 29th, 1841. On the same day was an entry by A. B. McCrea, Constable, of "no personal property to be found." Objection being made by defendant's counsel, the Court ruled out the *fi. fa.* and entries thereon, on the ground that the Tax Collector had no authority, by law, to issue execution for taxes, except in cases where the Grand Jury had allowed his insolvent list; and in all other cases it was the duty of the Tax Collector to seize and sell without execution; that the Constable had no authority to make the return of "no personal property;" but that plaintiff might prove, *aliunde*, that there was no personal property. To all of which rulings and decisions, the plaintiff's counsel excepted.

Plaintiffs then introduced parol proof, to show that there was no personal property, fiom which it appeared that John Deupree had no personalty, except such as the insolvent laws exempted from levy and sale.

The Court charged the Jury that there was no personal property exempt from levy and sale for taxes, under the laws of Georgia—debts due the State not being included in the provisions of the insolvent laws. To this charge, plaintiff, by his counsel, excepted.

There was an exception filed to the charge of the Court, as to the question of fraud, on the ground that it was not authorized by the evidence. Under the view taken by the Supreme Court, of the other questions made in the record, it is unnecessary to repeat all the evidence, for the purpose of reviewing this question.

B. Hill and E. R. Brown, for plaintiff in error.

H. K. McCay, for defendant in error.

*By the Court.*—Nisbet, J. delivering the opinion.

[1.] A proper understanding of the relation which the Tax Collector bears to the Government, and of the duties which grow out of that relation, will enable us to determine, without much difficulty, the main questions made in this record. The first and most important of these, is this : " has the Collector authority to issue an execution to enforce the payment of taxes ?" The Court below held that he has not, except in a single instance, to wit, against insolvent tax payers, after the allowance of the insolvent list by the Grand Jury. Upon a special grant, in the Act of 1804, this power in these cases, was conceded by the Court—the Court denying it to him generally. We differ with Judge *Warren,* and proceed to give our reasons : He is an agent of the State, by whom it exercises the sovereign prerogative of collecting, by coercion, if necessary, the taxes due by the citizen. He is not the agent of the people of his County, although they elect him—nor is he the agent of the Inferior Court of that County, but the agent of *the State.* The manner of his election and qualification, his duties and powers, and his compensation, are prescribed by law ; and to secure the State, in the execution of his trust, he is required to give bond and security. The great duty devolved upon him, is that of collecting the taxes assessed by law, for the support of the government. The digest of tax returns being handed to him, it is his duty to proceed to collect them, according to that digest. *Cobb's New Digest,* 1073. He is required to pay the general tax into the State Treasury, and the County tax to the proper County authority to receive it, at a time prescribed by law. And inasmuch as the realization, with promptness and certainty, of the public revenue, is, with the State, a matter of paramount importance, indeed of uncontrollable necessity, he is made, together with his sureties, subject to immediate and stringent process of enforcement, in the event of failure to pay ; he is made responsible to the Executive department. *Cobb's N. Dig.* 1046. If in default, he is not entitled to the ordinary rights of the citizen before the Courts of Justice. The State waits not for the tedious action of the Judiciary, in its usual forms of petition, process, defence, judgment and *fieri facias.* He may be com-

pelled to pay, by a process issued at once from the Treasurer of the State, the general tax in arrear; and by execution issued at once, by the Inferior Court, for the County tax in arrear. *Cobb's New Dig.* 1052, 1056, 1066. He is liable to pay 25 per cent. interest on the sum due, which is also collected by execution. *Cobb's New Dig.* 1025, 1066. For further security of the public revenue, the property of the Collector and of his sureties, is bound from the date of his bond. *Cobb's New Dig.* 1056. From these statements, it will be seen that the great obligation of the Collector is to collect and pay over the taxes; also what stringent measures are provided by law to compel him to promptness and fidelity; and what cautious guarantees are provided against the loss of the public money. It will also be seen how fearful is the responsibility which the Collector assumes. Now under these circumstances, it would be unjust—nay, ruinously impolitic, for the State to leave her officer without the powers necessary to do his duty. She has not so left him, but has armed him with a part of her sovereign authority, to be by him wielded, immediately and directly, and without let or hindrance, for the purpose of collecting the taxes. I do not mean to say that she has delegated this power, with discretion to use it according to his own will, but that she has specifically clothed him with the power of a process to collect, highest in its direct efficacy, known to the usages of constitutional government. Call it what you please—execution, warrant of execution, or distress warrant—it is the process used in this very case—a process by which the property of the defaulting tax-payer is seized and sold to pay his taxes: a process which he is to issue without a judgment—without the intervention of a Jury—without a hearing on the part of the defaulter—which he may himself execute, or which he may cause to be executed by the Sheriffs and Constables; and the progress of which, when issued to collect State taxes, the Judiciary may expedite, but cannot impede, at the instance of the defaulter. The power, in short, is the power of sovereignty, placed by the law in the hands of the State's agent, to be by him executed, through the agency of a process of seizure and sale—the power of compelling the citizen to *perform*

Doe *ex dem.* Gladney and another *vs.* Deavors.

*a duty,* which is the very first obligation of citizenship—which is indispensable to the very existence of the government and to the enjoyment of his rights under the government, to wit, the duty of contributing his proportion of the public revenue. See *Doe ex dem. Gladney and another vs. Deavors,* 8 *Geo. R.* 479 *to* 486. Neither the power, nor the mode of exercising it, is unknown to the Common Law, or new in our own State. It has been exercised in Georgia for forty-seven years, if no longer; it has been acquiesced in by the people and the Judiciary; it has been recognized by the Legislature ; and it has never been questioned until challenged in this case. I should, however, say that it is not really questioned in this case ; for it will be seen, I think, before I close this opinion, that the controversy here, is more about names than things. I should state, too, that the Court below does not question the power of the State to invest the Collector with authority to issue an execution for taxes. The presiding Judge seems only to deny that this has been done. We think it has been expressly. By the Act of 1804, it is made the duty of all persons liable to pay taxes, to pay them to the Collector on or before a time specified, which time has been changed by later legislation. And if, on that day, any one is a defaulter, the Collector, the law declares, " shall *immediately* proceed against such defaulter, by *distress and sale,* (giving the notice which the law requires and stating the amount of tax due by such defaulter,) *of goods and chattels, if any to be found ; otherwise of the lands of such defaulter or defaulters, or so much thereof, as will pay the taxes due, with costs."* Cobb's *N. Dig.* 1048. Herein, the power to issue a process to collect taxes is given, in so many words. From this clause in the Act of 1804, we have no doubt, was originally derived the usage, which has obtained from that day to this, of issuing *executions* for taxes. If the power is granted in the Act of 1804, there is no necessity of going farther back in search of it. That this clause of the Act of 1804, has been repealed, is not pretended. What enactments are found in the late Act changing, fundamentally, our system of taxation, in relation to this matter, if any, I do not know, as it has not yet been published. This

cause, however, is to be decided under the old law.  Whilst
the counsel for the defendant in error, admits under the Act of
1804, that the Tax Collector is authorized to *distrain* and sell,
he denies that he is authorized to issue execution to sell.  I
think that this is a distinction without a difference.  Whilst the
Statute says that he may collect by *distress* and sale, I think it
is very clear, that it intends a sale by *execution* in one legal
sense of *execution*.  It is clear to my mind, that the process is-
sued in this case, was legally issued under the Act of 1804 ; it
may not be, it is not a *fieri facias*, yet it is a process of execu-
tion.  If it be not an execution in one sense of that word, and
is in another—or if it is not in any sense strictly an execution,
yet is *the process* contemplated by the Act.  The Court erred in
denying to the Collector the power to issue it.  The old Com-
mon Law idea of distress, is the seizure of the property by a
landlord, to be held by him, as a pledge for the performance of
feudal service.  It came to be used as a remedy to collect rent
in arrear, and to compel the performance of other duties.  A
man was allowed to use it, independent of the Courts, to avenge
himself or to minister to his own redress.  But long before the
year 1804, it had lost its original character as a process of seiz-
ure and detainer, and had become a process for seizure *and sale,*
regulated by Statute.  From being a feudal power in the
hands of a landlord, to coerce payment of feudal dues or the
performance of feudal service, it became a remedy, in the
hands of a citizen, regulated by Statute, to coerce payment of
rent, or to avenge a trespass by cattle, damage feasant.  It
was no longer a process simply of seizure and detainer, but a
process of seizure and *sale ;* and when thus modified, it partook
at once of the nature of *an execution.*  It is distress, as it was un-
derstood at Common Law in 1804 ; (that is, a process of collec-
tion in the nature of an execution,) that the Act of 1804 in-
cludes.  This process was primarily " in nature of *a nomine
poenæ* to compel payment" and the right to sell was added by
Statute, and its whole character changed.  3 *Black. Com. C.
note* 8.  *Ibid,* 14.  3 *Kent,* 476.  It was a remedy also for a
debt due to the Crown.  In such cases, the property was salea-

ble.  3 *Black.* 14.   *Bro. Ab. t. Distress,* 71.   So also for an amendment imposed at a Court-Leet, (8 *Rep.* 41,) partly, says *Blackstone,* because, being the King's Court of record, its process partakes of the royal prerogative; but principally, because it is in the nature of an execution to levy a legal debt.   He farther says, that the distresses given by Statute, are in the nature of executions.   Although it was a remedy which an individual might use, without a judgment, yet it became a remedy even in his hands, in the nature of an execution.   But more particularly, distress was a remedy at Common Law, to collect debts due the Crown—or rather, I should say, to compel the performance of a duty, which the subject owed to the Crown.   Just in this light, the Legislature, no doubt, viewed it in 1804, to wit, as a means of compelling the citizen to perform the duty of paying taxes, which the law and the very nature of the civil compact impose upon him.   It is no new process—we get it from our fatherland.   Now, when used for this purpose in England, it was used as a process of seizure, with a power to *sell,* and was, therefore, in the nature of an execution.   To illustrate the view which I take of this matter, and save further elaboration, I refer to the case of *Hutchins vs. Chambers.*   The Justices had issued a warrant of distress, to compel the payment of a poor rate, under the Statute 43d Elizabeth.   The Justices, Parish Officers, Constables, and their assistants, were all sought to be made liable as trespassers.   Among other things, it was claimed that they were liable, because the property taken (*averia caruca*) was not liable to be distrained for a poor rate.   To this it was replied, that, although the process was a distress warrant, yet it was in the nature of an execution, and therefore, the property was liable to be seized and sold. The *nature,* therefore, *of this process,* was one of the matters submitted to Lord *Mansfield's* judgment.   He said: "the solid distinction is, that the seizing under the 43d *Eliz.* and such like Acts of Parliament, is but partly analogous to the Common Law distress, (as being repleviable, &c.) but is much more analagous to the Common Law execution, (like a *fieri facias,* where the surplus after sale, shall be returned.)   In the old Com-

mon Law distresses, which were in nature of a *nomine pœnæ*, to compel payment, it would have been absurd to have suffered the implements by which a man gained his livelihood to be holden as a pledge ; because, that would be taking from a man the only means he had of being able to pay the debt.    But this reason does not hold where the things distrained may immediately be sold, by way of satisfaction, *which although called distress, yet really is in this respect an execution.*   1 *Burrow*, 588.    This case not only declares a distress to be in the nature of an execution, but it illustrates the origin of the very remedy which the Legislature put at·the control of the Collector.    In England, Parliamentary duties, as poor rates, were collected by distress and sale.    So here, legislative duties, that is, duties or dues imposed by law, for public purposes, as poor rates, county taxes and general taxes, are collected by distress and sale, and the process of distress is an execution.    It is not a *fieri facias*, for one sufficient reason—*that* is founded on a judgment.    It must recite the judgment and follow it.    *This* process is not founded on a judgment—it issues without a judgment, and it is for this very reason that it is adopted.    The State cannot wait the tedious process of getting a judgment.    If she were compelled to do this, her honor might be compromitted and the rights of her citizens jeoparded.    Hence, she clothes her collecting agent with power to issue a process *at once*, which will *at once* command her means.    Of the same character is the power with which the Treasurer and the Justices of the Inferior Courts are clothed, to compel the Collector and his sureties to pay over the public moneys, when he is in arrear.    To prevent abuse and wrong to the citizen, the process is subjected to control by law. For example, provision is made for selling property for the payment of taxes, at public outcry and upon notice.    The tax, it may be further noted, falls under the Common Law designation of *a duty*.    It is not a debt due by contract, in a legal sense of contract, but the·payment of taxes is a duty which the citizen owes to the State.    He is not to be considered as owning property, so long as it remains undischarged.    It precedes and overrides all the obligations which grow out of contracts—it cannot

be superseded by liens—it is one of those deeply-laid founda-
tions upon which governmental superstructure rests.   At Com-
mon Law, the landlord might distrain himself or by his agent.
In the latter event, he  executed  a warrant  to  seize  and  sell.
Hence, the original of a distress warrant.   So  in  this  case,  I
have no doubt but it is competent for the Collector  to  execute
his own warrant;  but he may  also do  this,  through  the  Con-
stables and Sheriffs.   The  law  has  made  it their duty, in  so
many words, to execute his warrants or executions.   If  it  had
not, he would be authorized to use them as his agents,  for  that
purpose.   Their general power, as levying  and  collecting  offi-
cers, would authorize them to execute a  Tax  Collector's  execu-
tion,  when  placed in  their  hands.   But  the  Statutes  require
them to do it—point out the manner of doing it, and make them
amenable for neglect of duty.   Thus it  is,  that  we  hold :  1st.
That the Tax Collector can issue execution to collect taxes ;  and
2d.  That it may be executed by the  Sheriffs  and  Constables,
and that the Court erred in ruling the contrary.   Having  derived
the power of the Collector,  directly from the Act  of  1804, by a
course of reasoning and authority quite satisfactory to ourselves,
courtesy to the learned counsel for the  defendant  in  error, and
that alone, induces me to notice one  other  argument  used  by
him against the position, that it is  granted  to him  by  Statute.
The argument is, that the Legislature having given, in particular
cases, the power to issue execution, *eo nomine,* it is to be  taken
as having derived it, in all other cases, upon the maxim, *expressio
unius,* &c.   The answer to this argument is  conclusive.   Pow-
er to issue execution in the particular cases  is  given,  not be-
cause the Collector did not possess the power generally, but be-
cause he did not possess the power  in  those  particular  cases.
The general power did not extend to those  cases, and  therefore
the special grant in those cases.   If this be true, the maxim, *ex-
pressio unius,* &c. has no application.   Thus, for example, whilst
he had the power  to issue execution  against  the *tax-payer,*  he
had no power to issue execution *personally* against  his  executor
or administrator.   Hence, for reasons satisfactory to  the Legis-
lature, it gave him power, in certain contingencies, to issue exe-

cution against the executor or administrator, for the taxes of the decedent. So also he has power, generally, to issue execution against tax-payers, if they fail to pay, *after* the time of payment only; but the Legislature gave him power, where the tax-payer is about to *depart* the County, to levy for his taxes, unless he gives security, after his taxes are returned, *and before* the time of payment. *Cobb's New Dig.* 1049, 1050. So also, when the Grand Jury have allowed the insolvent list, the Collector is required to issue execution against the insolvents. Why? No doubt, because the Collector, without such express requirement, would have supposed, or might have supposed, that they were discharged, by being recognized by the Jury as insolvent, and that he had no authority to press them farther by execution. To guard against this evil, the power is expressly given in these cases. *Cobb's New Dig.* 1059. I have dwelt longer upon this exception than I would have done, but for the fact that I imagine that there prevails among the people very erroneous, or at least imperfect, views of the nature, powers, obligations and dangerous responsibilities of the Tax Collector's office.

[2.] The lands of the defaulter are not liable to be sold for his taxes, unless there are no goods and chattels to be found. *Cobb's N. Dig.* 1048. On this execution the Constable made a return, contemporaneous with the date of the levy, of no personal property to be found. The Court having ruled out the execution, consistently ruled out this return, and the plaintiff in error excepted. We holding that the execution was rightly issued and that it was competent for the Constable to execute it, hold, as a consequence, that it was competent for him to make the return. Any officer authorized to levy the execution, is authorized also, to return the fact that there is no personal property. It is a power incident to his office, as levying and selling agent. That fact cannot, in a contest about the title of the property, ordinarily, be made to appear by parol. It is a muniment of title, and must be evidenced by an official return. We think that the Court erred in excluding it, and erred in afterwards deciding that the party might show by parol, that there was no personal

property of the defendant in execution to be found. 3 *Kelly*, 224, 225.

[3.] The Court instructed the Jury, that no property was exempt from sale to pay taxes, and plaintiff in error excepted to this charge. By law, in this State, certain articles of property, such as bed and bedding, bed-steads, spinning wheel, a loom, a cow and calf, tools, cooking utensils, family Bible, &c. are exempted from levy and sale for debt. *Cobb's N. Dig.* 385. *Cobb's N. Dig.* 388, 389, 390, 391. The question made in this case was, whether the State is embraced within the operation of these laws; in other words, whether the property, exempt by law, from levy and sale to pay debts, is also exempt from levy and sale to pay taxes. These laws are founded in a humane regard to the women and children of families. The preamble to the Act of 1822 announces the grounds upon which the Legislature acted. "Whereas, (is its language,) it does not comport with justice or expediency, to deprive innocent and helpless women and children of the means of subsistence, be it therefore enacted, &c." *Cobb's N. Dig.* 385. *Justice* to women and children, in reserving the means of subsistence, and *public expediency*, or the interest which the State has in the sustenance and health and morality of the families of the people, were the inducements to this wisely benevolent legislation—legislation, standing in marked contrast with the heathenish severity of those laws, which, in some ages not very remote, not only subjected *liberty*, but also the *corpse* of a deceased debtor to the payment of debts. In this direction, progress has been improvement. In our judgment, *the State falls within the operation of a public law, passed for the benefit of the poor*, and *the State is within the policy of our own legislation upon this subject matter*. In England, as a general rule, the King is not bound by an Act of Parliament, unless expressly named therein. This is true here as to the State. No department of the Government can be divested of its constitutional powers, by an Act of the Legislature. Nor could the King be deprived of his prerogative by any general words in an Act of Parliament. The executive power shall not, then, be impaired by construction.

Hence, generally, laws relating to all the subjects of the realm, do not bind the Crown, unless the King be named. But to this general rule, there are exceptions. *Bacon* says, "the Crown is bound by the general words of a Statute, made for the maintainance of religion, the advancement of learning, or the support of the poor;" and he gives for it a conclusive reason, to wit, "because all Statutes in which the public are interested, ought to be so construed, that they may be effectual." *Bac. Ab. title Statutes, I. C.* 13 *Petersdorf Ab.* 704. 11 *Rep.* 71. *Smith's Com.* 620.    1 *Black. Com.* 261, 262.

So also the State is bound, although not named by an Act of the Legislature, for the maintainance of religion, the advancement of learning or the support of the poor. If not bound, such Acts might be defective in their operations. The whole public being interested, they must be so construed as to be effectual—that is, they must be so construed as to protect the rights of the public under them. This rule of construction imperiously demands that the Acts under review be construed so as to embrace and bind the State. Without such construction, they might be ineffectual. If the State is not bound by them—if the exempted articles can be sold for the tax of the citizen, then in cases where the whole property, the family Bible for example, will only be sufficient to pay it, the whole benefit of the law is lost to the family ; and in all cases the benefit of these laws is lost, and they become ineffectual, to the extent that the exempted property is applied to pay the tax. Such construction impairs no power of the Government. It does not interfere with the power to impose and collect taxes. It does not assume that the Legislature has not the right to impose the tax, or to appropriate all the property of the citizen to pay it. It goes upon the idea, that the Legislature has waived, for reasons of humanity and of State policy, the right in these cases to sell the exempted property, to pay taxes. That the Legislature may waive this right expressly, or expressly forbear to exercise it, I presume will not be questioned. I have no question but that it can do so, as in these instances, to an extent that does not in any sensible degree, abstract from the necessary revenues of

the State.   Should the Legislature, to suppose an extreme case, exempt *all* the property of the citizen from seizure and sale, to pay taxes, and thus defeat the tax-raising power, it would  present a different question.   We have no such question here.   Well, if this can be done expressly, it can be done,  and is done impliedly, in all cases where the  implication  is necessary to give  effect to a public law, relating to the promotion  of  learning,  the encouragement of  religion or the support of  the poor.

[4.]  The State is within the declared policy  of  the Acts.   It is the interest of  the State to foster the families of the people,  to provide for the health and   comfort  of women and children,  to preserve  the  charities  of family life, to  maintain  the wealth-creating,  virtue-engendering  and population-increasing power of the homes of the people.   This is not the place to enlarge upon the importance of preserving the means of subsistence to  women and children, and maintaining the union of the members of families, in a social and economical  and  monetary point of  view. Let it suffice for the stern purposes of judicial opinion,  to  say that the wealth and population of the State, its peace and order, and the happiness of the people at large, depend,  no  little,  in protecting the small modicum of land, and the little allowance of personal property, given by law to insolvents, from levy and sale to pay taxes.   If so, the State is within the policy of  these  exempting Statutes.   She will not  defeat her  own policy.   The Courts of justice will not so construe them as to  defeat or weaken that policy.

Upon these points we shall remand this cause ;  and the other questions, growing out of  the application for a  new  trial, need not be discussed.

Let the  judgment be reversed.