## The Trustees of the First Methodist Episcopal Church, South *vs.* The City of Atlanta *et al.*

[Jackson, C. J., being disqualified, did not preside in this case.]

1. In 70 *Ga.*, 817, this court held that an act of the general assembly conferring upon a municipal corporation authority to assess real property, abutting on a street, for improvements made thereon, did not involve the exercise of the taxing power, within the meaning of that term as used in the constitution, and there was a distinction between such assessments and taxation; but the question was not considered whether such assessments, being made and collected for the benefit of the public and as a substitute for other services required of the citizen to effectuate that particular purpose, were not in the nature of taxation; nor did this court hold that they were not " *ejusdem generis* " with ordinary taxation.

2. No corporation, whether private or public, can exercise any power not expressly conferred or necessarily implied to enable it to carry into effect the purposes for which it was created.

(*a.*) It can never be presumed that the general assembly intended, by

such local acts as that authorizing assessments for the improvement of streets, where they have used no language expressly referring to the matter, to modify, alter or change the general law or the uniform and unvarying practice of the government in relation to that and kindred subjects.

3. The policy of this state, as exhibited in its constitution and in the history of its legislation, is to encourage and advance religion and to foster charity, and an act allowing local assessments for street improvements will not be so construed as to violate this declared public policy, or as intending, by general expressions, to impose burdens upon religious or charitable institutions.

(*a.*) The constitutional inhibition against taking any money from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religionists, or any sectarian institution, does not conflict with the declaration of a public policy generally encouraging or advancing religion or charity, nor with the power granted to the legislature to encourage religious instruction, by exempting from taxation for the support of the state government places of religious worship.

(*b.*) It is dangerous to imply a legislative intent contrary to previous legislation from doubtful expressions which may admit of different interpretations.

4. It was not the intention of the legislature, in passing the act of September 3, 1881 (acts 1880-81, pp. 358-365), to make either public property or property held exclusively for the purposes of religious worship, or any other property named in §§798, 5182 of the Code, subject to the provisions of that act.

(*a.*) The trustees of the First Methodist Episcopal Church, South, of Atlanta could not create any lien, by their acts, upon the property they held in trust, without express authority to do so.

June 1, 1886.

Constitutional Law. Tax. Streets and Sidewalks. Public Policy. Religious Corporations. Laws. Construction. Trusts and Trustees. Before Judge MARSHALL J. CLARKE. Fulton Superior Court. September Term, 1885.

The trustees of the First Methodist Episcopal Church, South, filed their bill against the city of Atlanta and J. W. Loyd, the marshal thereof, to enjoin the sale by the marshal of the church building under a *fi. fa.* issued by the city against it for assessments amounting to $1,091.61 for pavements in front and on each side of the church, on Houston,

Trustees of the First Methodist Episcopal Church, South, *vs.* The City of Atlanta.

Peachtree and Pryor streets. The act under which the assessment was made was approved September 3, 1881 (Acts 1880–81, p. 359), and containe d the following provisions :

"Section I. *Be it enacted by the General Assembly of the state of Georgia*, That the mayor and general council of the city of Atlanta shall have full power and authority, in their discretion, to grade, pave, macadamize, and otherwise improve, for travel and drainage, the streets and public lanes and alleys of said city, and to construct sidewalks and pave the same, to put down curbing, cross-drains, crossings, and otherwise improve the same.

" Sec. II. That in order to fully carry into effect the authority above delegated, the said mayor and general council shall have full power and authority to assess the cost of paving and otherwise improving the sidewalks, including all necessary curbing for the same, on the real estate abutting on the street, and on the side of the street on which the sidewalk is so improved.

" Sec. III. That said mayor and general council shall also have full power and authority to assess one-third of the cost of grading, paving, macadamizing, constructing side-drains, cross-drains, crossings, and otherwise improving the roadway or street proper, on the real estate abutting on each side of the street improved : *Provided*, that before any street, or portion of a street, shall be so improved, the persons owning real estate, which has at least one-third of the fronting on the street, or portion of a street, the improvement of which is desired, shall, in writing, request the commissioners of streets and sewers to make such improvements, and said commissioners shall have approved the same, and shall forward the same, with their approval, to the mayor and general council, with a statement of the character of the improvement proposed to be made, and an estimate of the cost of the same, and said mayor and general council shall by ordinance direct the said work to be done. .

" Sec. IV. Said mayor and general council shall have full power and authority to adopt, by ordinance, such a system of equalizing assessments on real estate, for the above purposes, as may be just and proper, estimating the total cost of each improvement made, and pro rating the cost thereof on the real estate according to its frontage on the street or portion of a street so improved. . . .

" Sec. V. The amount of assessment on each piece of real estate shall be a lien on said real estate from the date of the passage of the ordinance providing for the work and making the assessment."

By said act it is also provided that no work shall be done for less than an entire block ; and that the collection

Trustees of the First Methodist Episcopal Church, South, vs. The City of Atlanta.

or said assessments may be enforced by execution issued by the city clerk.

The bill charged that the requirements of the act had not been complied with, and therefore that no lien or right to proceed by execution arose; that church property is, by the constitution of the state, exempted from taxation; that this is a species of taxation, or in the nature of a tax; that it is contrary to public policy to require a building used exclusively for church purposes to bear such a burden, and that it should not be included in the provisions of such an act unless expressly so stated; and that the complainants hold the property in trust, and the $fi. fa.$ is issued not against them, but against the church. They alleged that the remedy by affidavit of illegality is inadequate in this case.

The answer alleged that all of the requirements of the act were complied with; that the property levied on was subject to the assessment made; and that the complainants had an adequate remedy at law.

Affidavits as to compliance with the terms of the act were introduced. They need not be set out in detail.

The chancellor refused the injunction, and the complainants excepted.

HOWARD E. W. PALMER; HARRISON & PEEPLES, for plaintiffs in error, cited: All acts beyond the scope of the powers granted are void: 1 Dill. Mun. Cor. (3d ed.), §§89, 91, 96.

Conditions precedent must be strictly complied with before the corporation has any authority to act: 2 Dill. Mun. Cor. (3d ed.), §§769, 779, 800, 811; 51 Tex. 302; 11 Md., 1 6; 19 Mich., 39–47; 8 $Ga.$, 13; 4 Bush (Ky.), 464.

" The power of a city council in the matter of street improvements is a specially delegated authority, and the acts of the city government thereunder are legal only when in strict conformity with its directions:" 41 N. J. L., 90; 28 Ohio St., 542; 2 Dutch. (N. J.), 594, 600.

" It is high power and must not be extended by construction :" 6 Cush. (Mass.), 224–5.

There are no presumptions in favor of the city : 1 Dill. Mun. Cor. (3d ed.), §423 ; 89 Ill., 196–7 ; 12 *Ga.*, 430.

*Onus* is on city to show compliance with the law : 69 Pa. St., 365, 367, 368 ; 11 *Ga.*, 423 ; *Byars et al. vs. Curry et al.* 75 *Ga.*, 515 ; 5 Cow., 462, 465 ; 55 *Ga.*, 45 ; Code, §2182 ; 3 Am. R., 624 ; Cooley Const. Lim., t. p. 249.

Churches not covered by operation of statute: Code, §798 ; Cooley Const. Lim., t. p. 234, 583, 706–8 ; 70 *Ga.*, 817 ; 8 *Id.*, 23 ; 11 *Id.*, 79, 91 ; Code, §§659, 1060, 3939, 4574, 4575–4580, 4582, 2343 ; 67 *Ga.*, 492.

Public policy : 54 *Ga.*, 111 ; 11 *Id.*, 91 ; 8 *Id.*, 23.

Trust estate : Code, §2378.

No estoppel : Code, §3753 ; 105 U. S., 143 ; 75 *Ga.*, 14.

J. B. GOODWIN ; J. T. PENDLETON, for defendants, cited : A simple exemption from taxation is an exemption from general taxation for the support of the government, and not from special assessment for local improvements : 2 Dillon, § 777 ; *Ib.*, page 756 ; Cooley on Taxation, 458, note 1, 146 ; Burroughs on Taxation, 473, note 7 ; 10 Am. R., 35 ; 11 *Id.*, 412 ; 8 *Id.*, 480 ; 17 *Id.*, 153 ; 11 Johns, 77 ; 4 New York, 419, 432 ; 7 Md., 517 ; 31 Pa. St., 69 ; 4 Gill, 394 ; 24 Mo., 20, 26 ; 5 Am. & Eng. Cor. Cas., 535, 547.

If the property is liable for the tax, a mistake in the name of the owner is immaterial : 2 Mo. App., 193 ; 44 Mo., 137 ; 20 Pick., 418 ; Burroughs on Taxation, 288 ; 46 *Ga.*, 412 ; 69 *Id.*, 194.

The recitals in the ordinance are *prima facie* true : Cooley on Taxation, 465 ; 2 Dillon, page 797 ; Burroughs on Taxation, 478 ; 2 Desty on Taxation, 1353–4 ; 8 Md., 352 ; 34 Mo., 404 ; 30 *Id.*, 537 ; 60 *Id.*, 292 ; 38 *Id.*, 29 ; 69 *Ga.*, 194.

Estoppel : 29 Ind., 329, 331 ; 30 *Id.*, 192 ; 34 *Id.*, 141,

146 ; 94 Ill., 27, 7th head-note, and pages 34 and 35 ; 18 Mich., 496 ; 1 Cal., 455–7 ; 15 Ohio, 64, 68 ; 24 N. J. Eq., 143, 3d head-note; 25 N. J., 295 ; 38 Conn., 422, 432 (9th Am. R., 399) ; 10 Cush., 252–4 ; 7 Am. and Eng. Cor. Cas., 293 ; 71 *Ga.*, 107, 125–6 ; Code, §§2966, 3753 ; 59 *Ga.*, 171.

HALL, Justice.

1. In *Hayden vs. the City of Atlanta*, 70 *Ga.*, 817, we determined that an act of the general assembly conferring upon a municipal corporation authority to assess real property abutting on a street for improvements made thereon, did not involve the exercise of the taxing power within the meaning of that term as used in the constitution, and that there was a distinction between such assessments and taxation; and to that ruling we still adhere. We then maintained the constitutionality of the act now in question, on the ground that it was a rightful mode of carrying into effect the police power of the state in regard to the opening and repairing of streets and highways, and was a sanitary regulation which the legislature had authority to make, if, in their discretion, they deemed it essential to the convenience and health of the community upon which it was to operate. We did not then consider the question whether such assessments, being made and collected for the benefit of the public and as a substitute for other services required of the citizens to effectuate that particular purpose, were not in the nature of taxation, or whether they were *ejusdem generis* with ordinary taxation. The title of this very act, as well as some of its enacting clauses, associates them with such taxation, and to some extent indicates what was in the mind of the legislature upon that particular subject,—mainly the relation which assessments on account of benefits conferred by public improvement bore to ordinary taxation.

In Hammett *vs.* Philadelphia, 65 Penn. St. R., 146,

Judge Sharswood, who delivered the opinion of the court, after saying, "It may be considered as a point fully settled and at rest in this state, that the legislature have the constitutional right to confer upon municipal corporations the power of assessing the cost of local improvements upon the properties benefited," declares such assessments a species of taxation, and not the taxing of private property by virtue of eminent domain ; and in *Hayden vs. Atlanta*, we held that such an assessment was not an exercise of the right of eminent domain. See also *Jones vs. Sligh et al.*, 75 *Ga.*, 7, in which the distinction between the exercise of these powers and the power of taxation either for state or county purposes is carefully pointed out, and the manner and occasions on which each is to be resorted to and applied is limited and defined. This case arose under an attempt to levy a tax to carry into effect the provisions of the stock law, and we held that levy obnoxious to the provisions of the constitution in relation to the objects for which county taxes might be assessed ; no question of the exercise of police power was involved here, and the distinction between that and the laying of assessments for opening and keeping up streets and highways is made obvious, as was likewise done in Hammett *vs.* Philadelphia *ut sup.* We have deemed this discussion necessary to prevent confusion of subjects which should be kept distinct in the applications of the principles here announced to the case made by this record, and as explanatory of our view of the positions assumed by counsel for the city, who seemed impressed with the idea that the power of the municipal government to make and enforce the assessment in question upon the property of the church resulted from the recognition of the distinction between taxation and assessment, and from the liberal grant of authority to them contained in §§1, 2, 3, etc., of the act approved 3d September, 1881 (Acts 1880 and 1881, pp. 358 to 365.)

2, 3, 4. It is familiar learning that no corporation,

whether private or public, can exercise any power not expressly conferred or necessarily implied to enable it to carry into effect the purposes for which it was created. This is inseparable from the very definition of a corporation as given by our Code, §1670, which declares that it is " an artificial person created by law for specific purposes, the limit of whose existence, powers and liabilities is fixed by the act of incorporation, usually called its charter." Hence it follows that this is a high power, which cannot be extended by construction. In all matters of street improvements as well as others, a city government ordinarily acts under a specially delegated authority, and such acts are legal only when they conform strictly to the directions conferring the powers.

It is not pretended that " public property, or places of religious worship, or places of burial, or institutions of purely public charity," etc., exempted by law from taxation (Code, §798), are brought directly by name within the provisions of this act, and we do not think they can be brought within it by construction or necessary implication, unless it is made to appear that the property so exempted from taxation is used for purposes of " private or corporate profit or income." In case it should appear that such property. was used for the purpose of deriving private income or gain from it, then we should be of opinion there would be no occasion to resort to implication or construction to bring it within the city charter, the terms of which we consider sufficiently comprehensive and explicit to include it. The constitution by its terms inhibits the legislature from exempting such property, and declares any law passed with such object void. The law above cited follows the constitution in that as well as in all other respects relating to such exemptions. While it is true that a distinction exists between assessments made for benefits conferred by local improvements on the property thus improved and taxation, as that term is used in the constitution and laws of the state, and while the constitution

does not in express terms prohibit the legislature from passing laws authorizing such assessment and providing a process for collecting them, yet it should be borne in mind that these assessments so far partake of the nature of taxation as to be spoken of by judges, as well as by the community in general, as " local taxation for local purposes," or as " taxation on the benefits conferred, and not beyond the extent of those benefits," and that there are, from the nature of the power thus assumed, other necessary limitations to its exercise, as where it comes in conflict with the settled policy of the state as declared in its laws, or where it is against the unvarying practice of the government, or impairs or interferes with rights reserved by the fundamental law, such, for instance, as are excepted out of the general powers of the government and declared to be inviolate.  It can never be presumed that the general assembly intended by such local acts, where they have used no language expressly referring to the matter, to modify, or alter, or change the general law, or the uniform and unvarying practice of the government in relation to that and kindred subjects.  A construction which would leave the least doubt as to such a design does not seem to us to be warranted, and would be neither proper nor legitimate, and this is eminently true, when we take into consideration the serious consequences to which such legislation, when applied to places of religious worship, or to purely charitable establishments or public burial-grounds, which are not kept for gain or income, might lead.  This court has spoken on this question in no uncertain language.  In the *Mayor, etc., Savannah vs. Hartridge*, 8 *Ga.*, 23, it said, the history of the legislation of the state, in reference to a particular subject-matter of taxation, may be referred to as tending to aid in the construction to be given to the statute, and where the state has never taxed income, the power to do so in a corporation must appear by express words or unavoidable implication; that a charter authorizing a municipal corporation to tax real and personal

estate does not necessarily confer the right to tax income; that, in the construction of statutes made in favor of corporations or particular persons, and in derogation of common right, care should be taken not to extend them beyond their direct terms or clear import; and finally, that statutes levying taxes should be construed most strongly against the government and in favor of the citizen.

Where, let us ask, in the legislation of this state can a statute be found, which imposes any tax, or burden in the nature of such tax, either upon " public property," or upon " places of religious worship," or " places of burial," or upon " property used purely for charitable purposes?" When has any municipal corporation, created by our laws, or authorized by our constitution, under any general power to make assessments, ever before set up a claim to impose burthens for the support of the city government, or for the maintenance of its police powers upon property held by the public, or for purposes of religious worship or charity or sepulture? If there were nothing else but what is suggested by these considerations, we would find it impossible to conclude, without disregarding every rule of construction applicable to such cases, that the legislature ever intended to confer upon the city rulers and officers the power they are endeavoring to exercise. Does it not surpass belief that the framers of this act thought they were enabling the municipality to burthen and incumber the capitol grounds, located in Atlanta, with assessments, in order to open and keep their streets in order, to lay down pavements, to construct sewers, drains, etc., and upon failure or refusal to pay the assessment made for these purposes, to bring the capitol and the ground on which it stands to sale, and thus force the state to pay its portion of whatever liability was incurred for the making of such improvements? It is inconceivable that the legislature, by any general grant, could have relinquished its power over this subject even temporarily, so as to enable a few persons, owning one-third of the land in a block abutting on a street

in which its property happened to be located, to burthen it with the expense of such costly improvements as the city authorities might see proper to direct, and in certain contingencies to bring it to sale and divest the title of the state and oust it from its use and possession; and if they could not do this to the capitol grounds, why should they be entitled to do it to the county court-house and jail, the poor-houses, the various public schools, or the premises occupied by churches or charity hospitals, or such as are used for burial purposes? All these establishments are found in the same clause of the constitution, and of the act giving effect to it, with the public property, and, so far as concerns their liability to taxation, are placed upon precisely the same footing with it; and there is good reason for the close and intimate association of these several possessions, in that they are devoted, as well as the public property, to the attainment of the legitimate ends of government, and each contributes its share to securing that great and paramount object. The preamble of our constitution proclaims the purpose for which it was ordained and established, viz., " to perpetuate the principles of free government, insure justice to all, promote the interest and happiness of the citizens, and to transmit to posterity the enjoyment of liberty," and in order to secure these great blessings, the people of Georgia piously and devoutly invoked the protection and guidance of Almighty God. The policy of the state is to encourage and advance religion, as was said in forcible and eloquent language by the now venerated Judge Lumpkin, who delivered the opinion of this court in the case of *Doe, ex dem. Gladney, vs. Deavors,* 11 *Ga.,* 79, 91, and who showed by the law, as it then existed, that even the state itself was in the declared policy of the acts of the general assembly, passed with a purpose to foster the families of the people, to provide for their health and comfort, and to preserve the charities of life by doing whatever tends to promote the peace and good order of society.

Every government, to carry out its obligations to the people, it seems to us, is bound to adopt measures to promote these great objects. "The public recognition of religious worship," says an eminent author, "however, is not based entirely, perhaps not even mainly, upon a sense of what is due to the Supreme Being himself as the author of all good and of all law; but the same reasons of state policy, which induce the government to aid institutions of charity and seminaries of instruction will incline it also to foster religious worship and religious institutions, as the conservators of public morals and valuable, if not indispensable assistants in the preservation of public order." Cooley's Const. Lims., p. 471 marg. The bill of rights or declaration of fundamental principles which forms the basis of our state constitution, speaks in no uncertain terms upon this subject. Having guaranteed to all men the natural and unalienable right to worship God, each according to the dictates of his own conscience, and protected this right in all cases from control or interference by any human authority, and prohibited the civil authority from molesting the inhabitants of the state in person or property, or forbidding them denying to any one the power to hold a public office of profit or trust on account of his religious opinions, it declares in emphatic terms, "but the right of liberty of conscience shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state." So, too, on referring to our statute of charitable trusts, it will be found that this restriction upon the liberty of conscience is in substance repeated in terms only slightly variant from those found in the bill of rights, but none the less significant, clear or decisive. Code, §§3159, 5004, 5005. The duties enjoined by religious bodies and the enforcement by them of the obligations arising therefrom, though beyond the power or scope of the civil government, such as benevolence, charity, generosity, love of our fellow-men, deference to rank, to age and sex, tenderness to the young, active

Trustees of the First Methodist Episcopal Church, South, vs. The City of Atlanta.

sympathy for those in trouble or distress, beneficence to the destitute and poor, and all those comely virtues and amiable qualities which clothe life "in decent drapery" and impart a charm to existence, constitute not only the "cheap defence of nations," but furnish a sure basis on which the fabric of civil society can rest, and without which it could not endure. Take from it these supports, and it would tumble into chaos and ruin. Anarchy would follow order and regularity, and liberty, freed from its restraining influence, would soon degenerate into the wildest license, which would convert the beautiful earth into a howling pandemonium, fit only for the habitation of savage beasts and more savage men. The restraints thus imposed by inculcating duties and enforcing obligations, which, from the very nature of things, it is beyond the power of the state either to call into operation or to constrain obedience to, if they do not create, at least permeate, and impart vigor and give full effect to, its police regulations, thus rendering them efficient and practical; at least they become, in connection with the sanctions properly prescribed by law, indispensable instrumentalities in the administration of the government, and so they have ever been regarded by our legislators

No civil officer, from tne governor down to the bailiff of a district, no juror or witness is qualified to enter upon his office, or give testimony in any matter without taking an oath or equivalent affirmation, to the observance of which he solemnly and reverently appeals to the Supreme Being for help and guidance. Nor is this the only recognition by the state of its dependence upon this overshadowing, all-pervading and all-important influence in shaping and controlling the affairs of men and nations. Gifts and bequests for such purposes are more highly favored by our laws than other species of trusts. Courts of equity are placed under peculiar obligations to see, even in cases of bequests or devises, that the use is sustained and carried into effect, and in all cases where there is a general inten-

v 76-13

Trustees of the First Methodist Episcopal Church, South, *vs.* The City of Atlanta.

tion manifested by the testator to effect a certain purpose, and the particular mode in which he directs it to be done fails from any cause, a court of chancery may, by approximation, effectuate the purpose in a manner most similar to that indicated by the testator. Code, §2468, and citations. Again, " if the specific mode of execution " designated by the testator or founder or donor " be, for any cause, impossible, and the charitable intent be still manifest and definite, the court may, by approximation, give effect in a manner most consonant with the specific mode prescribed." *Id.*, §§3155, 3156, and cases cited. Nor does the law stop here in the high regard and favor shown by it to provisions having for their object (to adopt the language of the statute) " the relief of human suffering or the promotion of human civilization" (*Id.*, §3157, sub-sec. 8), for if " the terms of the bequest or deed are obscure, doubtful or equivocal," extraneous evidence may be resorted to " to ascertain the sense in which particular expressions are used," and this with a purpose of effectuating the intention of the creator of the trust, and with but a single limitation on the application of the principle, viz., that it may not be invoked to make that " definite which in itself is too indefinite for execution." *Id.*, §3160, and citations. These barriers to the execution of ordinary trusts are removed in the case of charitable trusts, and, as we are authorized to infer, these exceptions are made to promote their objects on account of their paramount importance to the maintenance and support of the authority of the commonwealth, in advancing the ends and securing the purpose for which all legitimate and orderly civil government is established, as set forth in the preamble to our constitution. The ministers of the various religious denominations are exempted from the performance of many public duties on account of the sacred character of their vocation, as jury, road and military duty, such as devolves upon the great body of the citizens.

The desecration of the Lord's day is prohibited in various

Trustees of the First Methodist Episcopal Church, South, vs. The City of Atlanta.

ways and under heavy penalties; worldly affairs, as a general thing, except in cases of necessity, cannot be transacted on Sunday; the keeping open of tippling-houses on that day is inhibited and classified in the same act of the legislature with "open lewdness and other notorious acts of public indecency tending to debauch the morals " of the people. Code, §4535. Places of worship on this day and other days when the services of the church are in progress are protected from intrusion by forbidding traffic from being carried on upon their grounds or in their immediate vicinity. Paper guaranties, unless protected and enforced by legal sanctions, are of no avail. Of what value would the right to conduct religious worship be, if it was subject to be interrupted and disturbed, either by the action of the government itself or by the conduct of every evil-disposed person to whom its salutary teachings were distasteful, and with the indulgence of whose wicked propensities and passions the lessons it inculcates, the duties it enjoins and the obligations it enforces might happen to interfere, in order to keep them within the bounds of decency and law? The constitution protects the right from governmental interference, and the law interposes to restrain and punish invasions or obstructions to its exercise by individuals. It is scarcely necessary to remark that it stands in more danger of being impaired by covert than by open attacks. The latter can be met and successfully resisted, while the approaches of the former, veiled under some plausible pretext, as the promotion of the commonwealth, are not so readily discernible and so easily warded off. If this right and the means provided for its exercise were subject to be assessed for the purpose of carrying on the government, it is possible that the impositions upon it might become too onerous to be borne by worshipping congregations, and they would be thus compelled to disband their organizations and submit to the confiscation of their property. No civilized government, at least no government claiming to be free, has ever gone so far as to lay on the instrumen-

Trustees of the First Methodist Episcopal Church, South, *vs*. The City of Atlanta.

talities of its administration, or the piety and benevolence of its citizens, a tribute so heavy and monstrous. This would not be the legitimate exercise of the power of raising revenue in any of its recognized modes or forms, but a total perversion and gross abuse of that power. It is no reply to this view of the matter to assert, as was done in this case, that the bill of rights (Code, §5006) declares, " No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religionists, or of any sectarian institution." The exemption here insisted on, we remark, is not at all in conflict with this clause of the bill of rights; it takes no money, either directly or indirectly, from the public treasury—nothing that ever could have gone into the public treasury—and appropriates it to the aid of any church, sect or religious denomination. The manifest object of the provision was to prevent any appropriation or subsidy that might look even remotely to the establishment of a state religion, and thereby prevent the full enjoyment of that freedom of worship secured by the same instrument to every inhabitant of the state.

Judge Cooley, Const. Lim., pp. 470, 471, has dealt directly with this subject, and has expressed reasons so sound and convincing as to entitle them to the careful study of all who are in pursuit of truth and correct principle, and what was said by him so fully conveys our own views that we offer no apology for transferring it at length to this opinion :

" But while thus careful to establish, protect and defend religious freedom and equality," says this eminent author, " the American constitutions contain no provisions which prohibit the authorities from such solemn recognition of a superintending Providence in public transactions and exercises as the general religious sentiment of mankind inspires, and as seems meet and proper in finite and dependent beings. Whatever may be the shades of religious belief, all must acknowledge the fitness of recognizing in

Trustees of the First Methodist Episcopal Church, South, *vs.* The City of Atlanta.

important human affairs the superintending care and control of the Great Governor of the Universe, and of acknowledging with thanksgiving His boundless favors, or bowing with contrition when visited with the penalties of His broken laws. No principle of constitutional law is violated when thanksgiving or fast days are appointed; when chaplains are designated for the army and navy; when legitlative sessions are opened with prayer or the reading of the Scriptures, or when religious teaching is encouraged by a general exemption of the houses of religious worship from taxation for the support of state governments. Undoubtedly the spirit of the constitution will require, in all these cases, that care be taken to avoid discrimination in favor of or against any one religions denomination or sect; but the power to do any one of these things does not become unconstitutional simply because of its susceptibility to abuse." Our constitution, while it takes away the temptation and power to make such discrimination either in favor of or against any one religious denomination or sect, leaves it open to the legislature to encourage religious instruction by exempting from taxation for the support of the state government " places of religious worship." Code, §5182.

In attributing to the legislature a purpose to confer upon this municipality authority to exact from religious bodies a commutation in lieu of police duties to the city, we should, by the sheerest and most strained implication and broadest construction, impute to them a design to allow it to exercise a power which it has always foreborne to exercise. It would be neither respectful nor just to a co-ordinate department of the government to insinuate remotely, much more to charge openly, that it entertained a purpose to ignore the former practice of the state or to reverse its policy declared by its statutes since its foundation, without, so far as we have been able to ascertain, exception in a single instance. Were it possible to ascertain the views of the members who composed that body, and who aided in the

passage of this act, we are satisfied that each and all of them would, with one consent, disclaim the purpose sought to be attributed to them; the truth is there was nothing in the bill which they were asked to enact into a law which called their attention to this particular grant of power, and had there been a special provision to that effect, we are not prepared to say that it would have secured their approval, and that it would not have resulted in a defeat of the measure. It is dangerous to imply from doubtful expressions, which may admit of different interpretations, a legislative intent; thus implied, repeals or modifications or alterations of a law, or on entire body of laws, are never favored, and are not allowed except in clear cases of necessity, and as we have said on several occasions, it is matter of doubt whether they exist at all under our present constitution. *Central Railroad vs. Hamilton*, 71 *Ga.*, 461; *Montgomery, ex'r, et al. vs. The Board of Education of Richmond County et al.*, 74 *Ga.*, 41.

From an examination of the various provisions of this act in relation to the conditions upon which the contemplated improvements may be had, as well as the methods of enforcing the assessments ordered, we are well satisfied that it was never the intention of the general assembly to make either " public property," or property held exclusively for the purposes of religious worship, or any other property name in §§798 and 5182 of the Code, subject to the provisions of that act. As to " public property " there can be no question. No attempt has ever been made to subject it by levy and execution to the payment of the assessment; on the contrary, both the legislature of the state and the congress of the United States have been petitioned to pay the amount assessed on their property, and both have rufused the prayer of the petitioner. Neither species of property had, or could have had, any voice in causing the improvement to be made, and had they responded favorably to the petition and paid the assessment, it would

have been a gratuity, and not the discharge of a legal obligation.   So the party holding property in trust for the First Methodist Church, South, of Atlanta, could have had no voice in inaugurating the improvement.   Trustees could not create any lien by their act upon the property they held in trust without express authority to do so. The act in question, while it creates a lien upon property within its terms, makes no express provision empowering such trustees either to petition for the improvement of an adjacent street or to encumber the trust property with such a charge; besides, the remedy provided for the enforcement of the lien is not that recognized by the law in such cases.   The absence of power to create such liens, and of appropriate remedies to enforce them, as well as all allusion to the tribunal having exclusive cognizance of the subjects, seems to us to afford an additional and a very strong reason that it was not the intention of the lawmakers to include this species of property within the scope and purview of the act, or to give the city authorities jurisdiction over it.   Being satisfied on this point, we doubt if we can take cognizance of other questions made in the case, as to a compliance with the conditions prescribed by the act for obtaining street improvements, or the form and substance of the process employed by the city to enforce the payment of such assessments against property which is subject to the charge; and even were we fully assured of our right to consider and determine such questions, we would refrain from its exercise, because in this case it could serve no practical purpose, and its consideration might possibly serve to retard or suspend a great and necessary system of municipal improvements which we should regard as a calamity not to be brought upon a prosperous and growing city, except for reasons of a more imperative nature than any advanced in the discussion of these minor topics.

For the reason that the property in question is not as-

sessable under the act, and is not within its scope and purview, we think the injunction should have been granted as prayed by the complainant, and we so order and direct. Judgment reversed.