*J. B. Hicks, T. E. Hightower, J. S. Adams,* and *R. E. Camp,* contra.

---

WILKERSON *et al. v.* CITY OF ROME *et al.*

1. The ordinance enacted by the City Commission of Rome requiring some portion of the King James version of the bible of either the old or new testament to be read, and prayer offered to God in the hearing of the pupils daily during the regular sessions of the school, is not in conflict with either of the following paragraphs of the constitution of Georgia: (*a*) Article 1, section 1, par. 12, Civil Code (1910), § 6368, which reads as follows: " All men have the natural and inalienable right to worship God, each according to the dictates of his own conscience, and no human authority should in any case control or interfere with such right of conscience." (*b*) Article 1, section 1, par. 13, Civil Code (1910), § 6369 which reads as follows: " No inhabitant of this State shall be molested in person or property, or prohibited from holding any public office or trust, on account of his religious opinions, but the right of liberty of conscience shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the State." (*c*) Article 1, section 1, par. 14, Civil Code (1910), § 6370, which reads as follows: " No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religionists, or of any sectarian institution."

2. Under the terms of the charter of the City of Rome the board of education has supervision and control over the public schools of said city. subject to the provisions of the charter and the ordinances lawfully passed by the city commissioners.

3. Mandamus is a proper remedy to require the board of education of the City of Rome to perform the duty imposed by the ordinance of the City of Rome; because mandamus is the only adequate, specific, and complete remedy to enforce such duty. While courts will not undertake to control the exercise of matters entrusted to the discretion of public-school officers, nor to compel such officers to do in a specific manner any act which involves discretion and judgment, it will issue to command said officers to act in the exercise of their discretion.

4. The court did not err, for any of the reasons stated, in granting a mandamus absolute. BECK, P. J., and HINES, J., dissent.

No. 2569. FEBRUARY 18, 1922.

Mandamus. Before Judge Wright. Floyd superior court. March 24, 1921.

The City of Rome, E. E. Lindsey as chairman of the Commission of the City of Rome, and E. E. Lindsey as a citizen of that city filed a petition against the individual members of the board of education of the city, reciting that it is the duty of the board of education, under the charter of the city, to supervise and control the public schools of the city in accordance with the provisions of the charter and ordinances of the city, and to carry into effect all ordinances duly and regularly adopted by the Commission of the City of Rome with reference to the government and conduct of the schools, and that said board of education has refused to carry into effect the provisions of an ordinance adopted by the City Commission, as follows, to wit:

" Be it ordained by the Board of Commissioners of the City of Rome, Georgia, and it is hereby ordained by authority of the same, that the Board of Education shall require some portion of the King James version of the Bible, of either the Old or New Testaments, to be read and prayer offered to God in the hearing of the Pupils of the Public Schools of the City of Rome daily during the regular sessions of these Schools, and that such time shall be allowed and appointed for these exercises as will admit of their being conducted with order and impressiveness. That these readings and prayers shall be conducted by the Principals of said Schools, or by persons invited by them for such services, and the selections of Scripture to be read shall be made by the persons conducting the readings, and the readings shall be without comment. Be it further ordained by the authority aforesaid, that exemption from attendance on these readings and prayers shall be granted to any pupil or pupils whose parents or guardians shall present to the Superintendent of the schools request in writing for such exemption upon the ground of conscientious objections." The prayer is that defendants be compelled by the writ of mandamus to perform the duty required of them by the ordinance.

The defendants filed an answer, in which, after denying that they are under any duty to comply with the provisions of the

ordinance, they plead: (*a*) Under the terms of the charter of the City of Rome they have authority, without interference from the Commission of the City of Rome, to prescribe and put into effect the course of instruction in said schools, and that the ordinance is a usurpation of their powers, privileges, and duties in this respect; that the ordinance is of no legal effect, because it deprives them of their legal right to supervise and control the public schools of the City of Rome, by providing that the readings and prayers required shall be conducted by the principals of said schools, or by persons invited by them for such service, and further providing that the selections of the scripture to be read shall be made by the persons conducting the readings, and by further providing that the prayers offered to God in the hearing of the pupils of the public schools shall be such prayers as the person offering should desire to make, without regard to their tenor or effect. Defendants say that this puts the supervision and control of the passages of the bible read, and prayers offered, in the hands of the principals of the schools, and removes any right or control over such principals from the board of education, and to this extent vests in the said principals the power and authority of selecting the course of instructions or readings from the bible, without regard to the opinion of the board of education, or its right and duty to supervise and control the said schools. The said ordinance further in this endeavors to vest the principals of the schools with the right, duty, and authority to select and invite other persons to read the bible and offer prayer. Said readings and offering of prayers, if it be a religious exercise, is prohibited by the law in public schools as stated; and if it be a course of instructions, then the person delivering said course of instructions must of necessity be a teacher, and the absolute right of selecting the teachers for the public schools is vested in the board of education by the charter of the City of Rome, and this ordinance is violative of such provision of the charter. Also, that this proceeding for mandamus is useless and of no effect, for the reason that said ordinance prescribes what shall be done by said principals of the public schools, and if the same is valid and enforceable there is no necessity for the board of education to enforce the same. (*b*) That the charter of the city provides a remedy for the failure of the school board to properly perform their duties, such remedy

being by removal from office; and therefore mandamus will not lie. (c) Said ordinance is in violation of article 1, section 1, par. 12, of the constitution of Georgia. (d) Said ordinance is in violation of article 1, section 1, par. 13, of the constitution of Georgia. (e) That said ordinance is in violation of the constitution of the State of Georgia as contained in par. 14, sec. 1, article 1, in that the reading of the King James version of the bible, either in its entirety or in part, and prayer without any restriction on or guide for the person offering the prayer, is in aid of the Protestant sect of the Christian Church. Such version of the bible is contrary to the beliefs, opinions, and teachings of the Roman Catholic sect of the Christian Church, and the reading of the new testament therein is contrary to the beliefs and opinions of those holding the Jewish faith, and there are many Roman Catholics in the City of Rome, whose children or dependents attend the public schools and who pay taxes on their property for the support and maintenance of the public schools, and there are many persons of the Jewish faith whose children or dependents attend the public schools and who pay taxes for the maintenance of the public schools, besides other probable sects and religions. Furthermore, there are only seven principals of the public schools in the City of Rome, and each and all of them are members of the Protestant sects of the Christian religion. These persons are vested with the right to read such portion of said version of the bible as they may desire, and to offer such prayers as they see fit, and furthermore to invite persons to perform such acts without restriction or guide. Such prayers may be highly sectarian, and the defendants have no power under said ordinance to prohibit the same. The defendants officially represent the City of Rome and the people of the city, no matter what their religious views, opinions, or convictions may be. The ordinance in question is violative of the three paragraphs of the constitution above set out, as well as of the charter of the City of Rome. No matter what may be said or given as a reason for the passage of said ordinance, it was passed for the purpose and has the effect of giving religious instruction to the children attending the public schools in the Protestant branch of the Christian religion; and such persons as would not desire their children or dependents to receive such instructions are simply allowed to have them

exempt from such instructions, but nevertheless the money which they pay for taxes is in part used for giving such religious instructions.

*Willingham, Wright & Covington,* for plaintiffs in error.

*Max Meyerhardt, Graham Wright,* and *Maddox & Doyal,* contra.

GILBERT, J. 1. The portions of the constitution of this State now under consideration are all found in the "bill of rights," article 1, section 1, paragraphs 12, 13, and 14. These paragraphs, declaring three distinct principles, may be referred to in their order as (1) freedom of religious conscience; (2) freedom of civil status; and (3) freedom from taxation for sectarian purposes. The precise question made in this case must not be overlooked. The reasons for the contention that the ordinance is violative of the above-mentioned paragraphs of the constitution are as follows: First, that the reading of the King James version of the Bible is in aid of the Protestant sect of the Christian religion. Second, that such version is contrary to the beliefs, opinions, and teachings of the Roman Catholic sect of the Christian religion. Third, that it is contrary to the beliefs and opinions of those holding the Jewish faith. Fourth, that there are many persons of the Jewish faith and others not of the Protestant Christian sect who pay taxes for the maintenance of the public schools, and that the principals of the public schools are all of the Protestant sect; and therefore there would be a discrimination and violation of the freedom-from-taxation clause of the constitution. It will conduce to a clearer construction by tracing to their origin the paragraphs of the constitution referred to, and ascertaining the evils intended to be cured by them. The founders and early settlers of America consisted in large part of persons who fled from the religious persecutions of the old world to the shores of the new world in search of religious freedom. In establishing a government for themselves founded upon principles of religious liberty they were by no means ungodly or insensible to the benefits of Christianity. There is abundant historical evidence, as well as the opinions of eminent statesmen and jurists for the statement that the pioneers in the formation and conduct of American colonial governments did not have it in mind to bring about a complete separation of Church and State. Indeed, as stated in 10 Mich. Law Review, 164, " It is doubtful if in a single one of

the colonies, before the revolution, there was absolute freedom of belief and worship. . . Thus, in every one of the American colonies the State already endeavored to interfere in matters religious, and in most of them a State Church was established." The colony of Georgia was not an exception to the general rule. In the charter granted to "The Trustees for establishing the Colony of Georgia in America" it was declared that "there shall be a liberty of conscience allowed in the worship of God, to all persons resident within the province, and that all such persons, except papists, shall have a free exercise of religion, so they be contented with the quiet and peaceable enjoyment of the same, not giving offence or scandal to the government." McElreath on the Constitution of Georgia, § 235; 1 Jones' History of Georgia, 92. In the year 1758 the province was divided into districts according to parishes. The parish at Savannah was designated as "Christ Church." The Church erected there and the burial place appurtenant thereto were designated as "Parish Church and Cemetery of Christ Church." It was provided that "Bartholomew Zouberbuhler, Clerk, the present Minister of Savannah, shall be the rector and incumbent of said Church of Christ Church, and he is hereby incorporated and made a body politick and corporate, . . enabled to sue and be sued, and shall have the cure of souls within said Parish, and shall be in the actual possession of the said Church with its cemetery and appurtenances, . . together with the glebe land already granted to him." It was further provided that for the purpose of church repairs, care of cemeteries, to pay the salaries of the clerk and sexton, the rector and his church officials were authorized to levy a tax on the estate, real and personal, of all the inhabitants within their respective parishes. While the patronage of the crown and of the colonial assembly was extended in this special manner in aid of churches professing the Episcopal faith, it was not designed to favor them by an exclusive recognition. Apparently it was intended to place the Episcopal Church on much the same basis as it existed in England. Mr. Jones, in his history, says "There can be no doubt, however, but that it was the intention of the government, both royal and colonial, to engraft the Church of England upon the province." 1 Jones' History of Georgia, 527.

We have no reported case arising in the colony of Georgia, in-

volving the freedom-of-religious-conscience clause of the royal charter to Georgia; but in the colony of Massachusetts, where a similar religious-liberty covenant existed, the question did arise. The provision in the colonial statute of Massachusetts was substantially identical with the ordinance of Rome, Ga., now under consideration, except that the former, in addition to providing for the reading of the bible and prayer, also provided " that the pupils learn the Ten Commandments and repeat them once a week." In this case, Commonwealth *v.* Cook, decided in 1859, reported in 7 American Law Register, 417, a son of the complainant, eleven years of age, a pupil in a public school, was chastised by the teacher for a refusal to comply with the requirements of the school in the matter. The case arose on the prosecution of the teacher. The court elaborately discussed the question, and, rejecting the contention of the complainant, said in part: " Our schools are the granite foundation on which our republican form of government rests.. They were created and are now sustained by our constitution and laws, and the almost unanimous voice of the people. But a pupil in one of them has religious scruples of conscience, and cannot read or repeat the Commandments, unless from that version of the Bible which his parents may approve. . . If the plea of conscience and his constitutional rights would protect him from reading the Bible, is it not equally clear that he could not be compelled to hear it read? If, then, these are constitutional rights, secured to the children in our common schools, at any time when one pupil can be found in each public school in the Commonwealth with conscientious scruples against reading the Bible, or hearing it read, the Bible may be banished from them, and so the matter of education may be taken from the State government and placed in the hands of a few children. Not Roman Catholic children alone. For if the plea of conscience is good for one form of sectarian religion, it is good for another. .The child of a Protestant may say, ' I am a conscientious believer in the doctrine of universal salvation. There are portions of the Bible read in school which it is claimed by others tend to prove a different doctrine; my conscience will not allow me to hear it read, or to read it.' Another objects as a believer in baptism by sprinkling. ' There are passages in the Bible which are believed by some to teach a different doctrine. I cannot read it; conscience is in the

way.' Still another objects as a believer in one God. 'The Bible, it is claimed by some, teaches a different doctrine; my conscience will not allow me to read it or hear it read.' And so every denomination may object for conscience sake, and war upon the Bible and its use in common schools. Those who drafted and adopted our constitution could never have intended it to meet such narrow and sectarian views. That section of the constitution was clearly intended for higher and nobler purposes. It was for the protection of all religious — the Buddhist and the Brahmin, the Pagan and the Jew, the Christian and the Turk, that all might enjoy an unrestricted liberty in their religion, and feel an assurance that for their religion alone they should never, by legislative enactments, be subjected to fines, cast into prisons, starved in dungeons, burned at the stake, or made to feel the power of the inquisition." Antedating the decision of this case, and continuing thereafter under the leadership of Roger Williams of Rhode Island, the movement for the separation of Church and State proceeded with ever-increasing volume and strength. It should be clearly understood, however, that this was not a movement for the separation of State from Christianity, but specifically a separation of Church and State. Christianity entered into the whole warp and woof of our governmental fabric. Many of the statesmen of this country treated Christianity as a part of the law of the land. In the Declaration of Independence God, as our creator, was acknowledged as follows: " We, therefore, the representatives of the United States of America, in general Congress assembled, appealing to the Supreme Judge of the world for the rectitude of our intentions, do " etc. " And for the support of this declaration, with a firm reliance on the protection of Divine Providence, we mutually pledge to each other our lives, our fortunes, and our sacred honor."

Edward Thomson, in 20 Case & Comment, 525 et seq., has furnished a most interesting paper on the subject of the relation of religion to our government. He quotes from Cooley's Constitutional Limitations and Story on the Constitution, showing a construction by these eminent authors with which we find ourselves in accord. He makes the claim that Christianity is the only religion known to our American law; that marriage, usury, the doctrine of charities, and the like are all derived from the Christian religion. He draws attention to the fact that when our

49

chief executive is inaugurated he is sworn upon the Bible, and he quotes from the last inaugural address of President Cleveland this language: "Above all, I know there is a Supreme Being whose goodness and mercy have always followed the American people, and I know he will not turn from us now if we humbly and reverently seek his powerful aid." Similar language is quoted from the addresses of other presidents, and attention is called to the fact that religious proclamations and national thanksgiving proclamations have been issued by our presidents for more than a generation. We will add that General Washington, in his first inaugural address in 1789, said: "It would be peculiarly improper to omit, in this official act, my fervent supplications to that Almighty Being who rules over the Universe, who presides in the councils of nations, and whose providential aid can supply every human defect, that his benediction may consecrate to the liberties and happiness of the people of the United States. . . . No people can be bound to acknowledge the invisible hand which conducts the affairs of men more than the people of the United States." Lincoln, in his famous Gettysburg address, expressed this sentiment: "That this nation, under God, shall have a new birth of freedom." Daniel Webster, in his great speech in the Girard College case, said: "The massive cathedral of the Catholic, the Episcopalian Church with its lofty spire pointing heavenward, the plain temple of the Quaker, the log church of the hardy pioneer of the wilderness, the mementoes and memorials around about us, the consecrated graveyards, their tombstones and epitaphs, their silent vaults, their moldering contents, all attest it. The dead prove it as well as the living. The generations that are gone before speak to it and pronounce it from the tomb. We feel it. All, all proclaim that Christianity, general, tolerant Christianity, Christianity independent of sects and parties, that Christianity to which the sword and fagot are unknown, general, tolerant Christianity, is the law of the land." 7 Works of Daniel Webster, 176. Professor Goddard, in 10 Mich. Law Review, at p. 166, said: "In every colony were men who had seen and sorely felt the evils of church control by the State, and to them it must have seemed clear how infinitely the difficulties would be multiplied if the Federal Government undertook to interfere in the establishment of any form of religion. At all events, upon the proposition of Charles Pinckney

of South Carolina, sec. 3 of article 6 of the Federal constitution, which provided for the oath to be taken by officers to support the constitution, closed with that famous clause: ' But no religious test shall ever be required as a qualification to any office or public trust under the United States.' The Federal constitution was afterwards amended prohibiting any law respecting the establishment of a religion or prohibiting the free exercise thereof. Civil Code (1910), § 6684. The article just referred to denies that this provision of the Federal constitution can be attributed to atheism, and contends that every one of its members was a believer in God, and most of them were Church members, including General Washington. The article further says: " Of all its members Franklin has been regarded as least orthodox. And yet, during its deliberations, when it seemed impossible to harmonize the varying opinions, Franklin offered his celebrated resolution, in which he moved that ' henceforth prayers imploring the assistance of heaven and its blessings upon our deliberations be held in this assembly every morning before we proceed to business, and that one or more of the clergy of the city be requested to officiate in that service.' In support of this resolution Dr. Franklin, among other things, said: ' I have lived, sir, a long time, and, the longer I live, the more convincing proofs I see of this truth — that God governs in the affairs of men. And if a sparrow cannot fall to the ground without his notice, is it possible that an empire can rise without his aid? We have been assured, sir, in the sacred writings that ' except the Lord build the house, they labor in vain that build it.' I firmly believe this; and I also believe that, without his concurring aid, we shall succeed in this political building no better than the builders of Babel.' " Salmon P. Chase, Secretary of the Treasury, declaring that " no nation can be strong except in the strength of God, or safe except in his defense, the trust of our people in God should be declared on our national coins," ordered the Director of the Mint to prepare a suitable motto. Finally " In God We Trust " was selected, and for nearly sixty years our national coins have borne that motto. In 1907, during the administration of President Roosevelt the motto was omitted from the eagle and the double eagle, but in response to a general demand the Congress restored it. Catalogue of Coins, Tokens, etc., Treasury Dept. 1914, p. 16. The constitutions of every State in

the Union contain provisions similar to those found in the constitution of Georgia, and practically all of them, though varying in language, contain the three elements of religious freedom of conscience; freedom of the civil status on account of religion, and freedom from taxation for sectarian purposes. All of these draw their inspiration from a common source. It is confidently asserted that those cases not in accord with the view which we take have fallen into their error by overlooking the source of their constitutional provisions, to wit, section 16 of the Virginia Bill of Rights of 1776, and the famous Virginia Religious Liberties statute of 1785 written by Thomas Jefferson. The Virginia Bill of Rights did not include a freedom-from-taxation clause. The freedom-from-taxation portion of the Jefferson statute is as follows: "No man shall be compelled to frequent or support any religious worship place or ministry whatsoever." Considering the words of this statute, it is clear that it intended to prohibit the creation of any State religion or the support of any particular Christian sect. This was so important, in the view of Mr. Jefferson, that he caused it to be written on his epitaph as one of three chief achievements; the other two being the Declaration of Independence and the founding of the University of Virginia. This statute, as written by Mr. Jefferson, was pressed to its adoption by James Madison, and the immediate cause of its passage throws tremendous light upon its meaning. As stated by Mr. Schofield, 2 Constitutional Law, 463: "The immediate cause of that statute was a bill introduced in the Virginia legislature in 1784 to lay a tax for the benefit of the clergy of all Christian sects in Virginia, leaving the taxpayer free to designate on the collector's warrant the particular sect the taxpayer wanted to give his money to." And further: "Jefferson's statute was not aimed at the Christian religion; it draws a clear line between the clergy and religion: it divorced the church from the State, but not the State, i e., the people, from the Christian religion."

The first constitution of Georgia, that of 1777, provided as follows: "All persons whatever shall have the free exercise of their religion, provided it be not repugnant to the peace and safety of the State, and shall not, unless by consent, support any teacher or teachers, except those of their own profession." This provision, it will be observed, was not antagonistic to the idea in

the proposed Virginia statute of 1784, and did not prohibit all taxation for sectarian purposes. In the constitution of 1789 the religious liberty provision did not in substance differ from that of 1777. In the constitution of 1798 a similar provision, but not differing in substance from the two previous ones, appears. In the constitution of 1861, after declaring in the second paragraph that "God has ordained that men shall live under government," it was declared in paragraph 7: "No religious test shall be required for the tenure of any office; and no religion shall be established by law; and no citizen shall be deprived of any right or privilege by reason of his religious belief." In the constitution of 1865 the provision of the immediately previous constitution was in substance repeated, and so it was in the constitution of 1868. That brings us to the constitution of 1877, with which we are now dealing, and which was the first to contain the freedom-from-taxation clause. From an examination of all of them and of their origin, we think it clearly appears that the framers of our constitutions have never intended to declare the policy of this State to be unreligious or unchristian. They did intend, in the constitution of 1877, to prohibit taxation for the support of any church, denomination, or sectarian institution maintained as a State institution. Indeed the protection afforded by the constitution is a protection to individuals, and not to Churches; and this theory is in accord with the ablest thinkers on the subject. It is not specifically contended here that the religious belief of any individual, certainly not of any adult citizen, is interfered with in an unconstitutional way by the ordinance in question. It is contended that the enforcement of the ordinance would be to instruct the school children in the teachings of the bible in a manner contrary to the beliefs of the Roman Catholic Church and of those of the Jewish faith. But assuming, for the sake of argument, that the contention is broad enough to include individual members of the church, we think that certainly as to paragraphs 12 and 13 of the constitution, relating to religious freedom of conscience and freedom of civil status, there can be no merit in the contention. It would require a strained and unreasonable construction to find anything in the ordinance which interferes with the natural and inalienable right to worship God according to the dictates of one's own conscience. The mere listening to the reading of an extract

from the bible and a brief prayer at the opening of school exercises would seem far remote from such interference. It would be equally difficult to find anything in the ordinance which could in any way molest any inhabitant of this State in person or property, or prohibit him from holding any public office or trust, on account of religious opinions. Finally, when it is noted that pupils whose parents or guardians so request may, under the terms of the ordinance, be excused from attendance on bible reading and prayers, the whole contention of plaintiffs in error as to paragraphs 12 and 13 must crumble into nothingness. As to the freedom-from-taxation clause, paragraph 14, the privilege of the pupil to be excused has no relation. It stands upon quite another basis.

Our constitution, article 1, section 1, par. 14 (Civil Code (1910), § 6370), declares as follows: "No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religionists, or of any sectarian institution." It is this section of the constitution upon which plaintiffs in error must chiefly depend. Fortunately the meaning of paragraph fourteen has already been construed by this court. In the case of *Trustees of First Methodist Church* v. *City of Atlanta*, 76 *Ga.* 181, the constitutionality of a statute of the General Assembly was attacked on the ground that it was violative of the paragraph of the constitution now under consideration. The act of the General Assembly (Acts 1880-81, p. 359) was one giving to the City of Atlanta authority to grade, pave, and otherwise improve its streets, and to assess the cost thereof against abutting real estate. The city paved streets on each side of the First Methodist Church on Houston, Peachtree, and Pryor Streets, and issued a fi. fa. against the church for the amount of the assessment. The trustees of the church filed a petition to enjoin the sale by the city marshal, contending that such property, under the constitution, was exempted from taxation, and that this was a species of taxation, and that the property of the church was exempt therefrom. The legal question there considered was different from the question now before us, but the interpretation by the court at that time is important. In the opinion the court calls attention to the fact that "no civil officer, from the Governor down to the bailiff of a district, no juror or witness, is qualified to enter

upon his office, or to give testimony in any matter without taking an oath or equivalent affirmation, to the observance of which he solemnly and reverently. appeals to the Supreme Being for help and guidance." Reference is also made to the fact that " desecration of the Lord's day is prohibited in various ways and under heavy penalties; worldly affairs, as a general thing, except in cases of necessity, cannot be transacted on Sunday," etc.; that places of religious worship and church services are protected from intrusion. And we will add that in the preamble to the constitution of Georgia are found these words " We, the people of Georgia, relying on the protection . . of Almighty God, do ordain and establish this constitution." In reference to the constitutional provision, article 1, section 1, paragraph 14, the court said: " The manifest object of the provision was to prevent any appropriation or subsidy that might look even remotely to the establishment of a State religion, and thereby prevent the full enjoyment of that freedom of worship secured by the same instrument to every inhabitant of the state. Judge Cooley, Const. Lim., pp. 470, 471, has dealt directly with this subject, and has expressed reasons so sound and convincing as to entitle them to the careful study of all who are in pursuit of truth and correct principle, and what was said by him so fully conveys our own views that we offer no apology for transferring it àt length to this opinion. 'But thus careful to establish, protect, and defend religious freedom and equality,' says this eminent author, 'the American constitutions contain no provisions which prohibit the authorities from such solemn recognition of a superintending Providence in public transactions and exercises as the general religious sentiment of mankind inspires, and as seems meet and proper in finite and dependent beings. Whatever may be the shades of religious belief, all must acknowledge the fitness of recognizing in important human affairs the superintending care and control of the Great Governor of the Universe, and of acknowledging with thanksgiving His boundless favors, or bowing with contrition when visited with the penalties of His broken laws. No principle of constitutional law is violated when thanksgiving or fast days are appointed; when chaplains are designated for the army and navy; when legislative sessions are opened with prayer or the reading of the Scriptures, or when religious teaching is encouraged by a general exemption of the houses of religious wor-

ship from taxation for the support of state governments. Undoubtedly the spirit of the constitution will require, in all of these cases, that care be taken to avoid discrimination in favor of or against any one religious denomination or sect; but the power to do any one of these things does not become unconstitutional simply because of its susceptibility to abuse.' Our constitution, while it takes away the temptation and power to make such discrimination either in favor of or against any one religious denomination or sect, leaves it open to the legislature to encourage religious instruction by exempting from taxation for the support of the State government 'places of religious worship.' Code, § 5182 [1910, § 6554]."

Similar questions have been before the courts of many States. For a consideration of divergent views reference is made to the following as representative, but not as exhaustive. As holding the majority view of the question, to the effect that reading extracts from the bible and prayers in public schools did not offend the constitutional provision against the appropriation of public moneys in aid of sectarian institutions or denominations of religionists, the following cases contain able and comprehensive discussions of the question: Hackett v. School District, 120 Ky. 608 (87 S. W. 792, 69 L. R. A. 592, 117 Am. St. 599, 9 Ann. Cas. 36); Pfeiffer v. Board of Education, 118 Mich. 560 (77 N. W. 250, 42 L. R. A. 536); Church v. Bullock, 104 Texas, 1, 109 S. W. 115 (16 L. R. A. (N. S.) 860); Moore v. Monroe, 64 Iowa, 367 (20 N. W. 475, 52 Am. R. 444); Donahoe v. Richards, 38 Me. 379 (61 Am. D. 256): Spiller v. Woburn, 94 Mass. 127. As entertaining the minority view that such religious readings and prayers are unconstitutional, the following cases are cited for able and elaborate discussion: Freeman v. School District, 65 Neb. 853 (91 N. W. 846, 93 N. W. 169, 59 L. R. A. 927); State ex rel. Weiss v. School Board, 76 Wis. 177 (44 N. W. 967, 7 L. R. A. 330, 20 Am. St. R. 41); People v. Board of Education, 245 Ill. 334 (92 N. E. 251, 29 L. R. A. (N. S.) 442, 19 Ann. Cas. 220). The case of Herold v. School Directors, 136 La. 1034 (68 So. 116, L. R. A. 1915D, 941, Ann. Cas. 1916A, 806), is in line with the majority in so far as it affects those of the Roman Catholic belief, but with the minority in so far as those of the Jewish faith are concerned. From the opinion we quote as follows: " It is generally accepted

that the Old Testament was originally written in Hebrew, and that the New Testament was originally written in Greek. The first complete English translation is said to have appeared about the year 1383. The Geneva Bible, embracing the New and Old Testaments, was translated into English at Geneva in 1560, and in London in 1576; it was the first to omit the Apocrypha. There is the King James version, or translation, of the year 1604; the Douay version or translation of the New Testament at Rheims in 1582; and the Old testament at Douai in 1609. There is Luther's Bible, 1521; and then there is the Rabbinical Bible. There is also the Koran, often called the Mohammedan Bible. There are doubtless differences in the several translations of the Bible just referred to. But it is not within the province of the court in this case to point out these differences, or to give them consideration. The court recognizes the difference between the Rabbinical Bible and the Christian Bible, in that the latter adds to the former the New Testament Scriptures, which are the bases of the Christian religion. There may be other differences, such as the inclusion in the one, and the exclusion from the other, of the Apocrypha. But this difference is immaterial in the matter before the court. Christians make daily use of the Old Testament Scriptures, and the differences between the Rabbinical and Christian editions are not known to the ordinary lay reader beyond the fact that the Christian Bible contains the New Testament. The same condition of mind exists with reference to the Douay and the King James translations. There are said to be some differences and some errors in translation, but they are not known to the ordinary lay reader; and the court is not called upon to point out these differences. They are both Christian Bibles, or Bibles of the Christians." In that case it was also held that a requirement that extracts from the New Testament be read in public schools was a discrimination against Jews, because " he denies that the New Testament is the Word of God, and he denies our Savior. He does not deny most of the moral teachings of Jesus Christ, but he denies his divinity and his resurrection." In our opinion the ordinance in question is no more a discrimination under the. constitution against those of the Jewish faith than those of the Roman Catholic belief. The mere reading of extracts from the New Testament of the Bible in the public schools cannot in any legitimate

sense be considered as an appropriation of public moneys to the support or establishment of a system of religion or a sectarian institution. It is true that the teachers of the public schools are paid from the proceeds of public taxation, and that an insignificant fraction of their time would be consumed in the reading. If the theory contended for could once be established, it might easily be carried to an absurd extent. For·instance, it might, as an inference from such a ruling, be contended that the inclusion in the school curriculum of books containing denials of the teachings of Darwin, Brahma, Buddha, or Confucius, and the like, would be teaching sectarian doctrines, and therefore in conflict with the constitution of Georgia. We quite agree with the Supreme Court of Louisiana that " the court will not concern itself with the differences or alleged errors in the different translations of the Christian Bible or Bible of the Christians."

In the case of Pfeiffer *v.* Board of Education, 118 Mich. 560 (77 N. W. 250 42 L. R. A. 536), the question was substantially the same as the one with which we are now dealing. In the opinion it was said: " It is not to be inferred that  .  .  the convention intended to prohibit in the public schools all mention of a subject [morality and religion] that schools were to be established to foster,— particularly as the provision, when traced to its historic origin [the Virginia Constitution and statute of Jefferson], is shown to have been aimed at quite another evil." The court decided that the reading of extracts from the Bible is not in violation of any constitutional provision. Paraphrasing the language used in Donahoe *v.* Richards, 38 Me. 379 (61·Am. D. 256), we will say that no theological doctrines are required to be taught. The creed of no sect must be affirmed or denied. There is no necessary interference, by way of instruction, with the views of the scholars, whether derived from parental or sacerdotal authority. " Reading the Bible is no more an interference with religious belief than would reading the mythology of Greece or Rome be regarded as interfering with religious belief or an affirmance of the pagan creeds. A chapter in the Koran might be read, yet it would not be an affirmation of the truth of Mohammedanism, or an interference with religious faith." No one is required to believe, or punished for disbelief, either in its inspiration or want of inspiration, in the fidelity of the translation or its accuracy, or

in any set of doctrines deducible or not deducible therefrom. The plaintiffs, in the trial court, admitted that the reading of the King James version of the Bible was contrary to the beliefs, opinions, and teachings of the Roman Catholic Church, and that the reading of the New Testament is likewise contrary to the beliefs of those citizens holding the Jewish faith. This can have no effect on the meaning of the constitution, which, as we hold, fails to show any violation of constitutional rights.

The case of People v. Board, 245 Ill. 334 (supra), goes to greatest extremes in taking a contrary view of the question, and for that reason it is selected for discussion. An analysis and criticism of this case by a leading member of the bar of Illinois, a professor in Northwestern University (Ill.), is of peculiar value and should carry more weight for that reason. Such we find in Mr. Schofield's work on Constitutional Law, edited and published after his death by the law faculty of Northwestern University. That the analysis was thorough is shown by the fact that it, together with marginal notes of authorities, comprises pages 459 to 509, inclusive. In that case there was a majority opinion concurred in by five Justices, and a dissenting opinion by two Justices. It cites as authority the cases of Freeman v. School District, and State ex rel. Weiss v. School Board, supra; and we think Mr. Schofield is sustained in his statement that neither of these cases is sufficient to support the majority opinion in its entirety, because they hold, at most, that Bible-reading may be so conducted in the public schools as to discriminate against those of the Roman Catholic faith, and therefore he concludes that the majority opinion "makes Illinois the only State in the Union which puts the constitutional padlock on the Bible in the public schools." He shows the origin of the Illinois constitutional provisions to be the same as that to which we have traced the Georgia provisions, and thus accounts for the fundamental error in the majority opinion. In reference to the source of these constitutional provisions, he makes the following comment: "Mr. Justice Story concisely expresses, in his work on the Constitution, the effect of the guarantees of religious liberty, as they appear in the Virginia constitution of 1776 and in the Virginia statute of 1785, in the Illinois bill of rights, and in the first amendment to the Federal constitution, as limitations on the power of or-

ganized government," and quotes from 2 Story on the Constitution, § 1877: 'The real object was   .  .  to exclude all rivalry among Christian sects, and to prevent any [governmental] ecclesiastical establishment, which should give to a hierarchy the exclusive patronage of   .  .  the government.'" He asserts that the proposition ultimately rests, not on the ground that reading the Bible in the public schools molests a person in the exercise of religious professions, worship, or opinion, but on the ground that reading the Bible in the public schools molests the taxpayer without any regard to his religion or want of religion. "Reading the Bible in the public schools, even as a mode of worship, does not transform the teachers into an order of clergy to attend upon the offices of religion; nor does it transform the appropriation to pay the salaries of the teachers into an appropriation to help support the clergy of any sect; nor does it transform the schoolhouses into churches or places of worship; nor does it confine the occupation of teaching in the public schools to the members of any sect." And further "the truth is, none of the original religious-liberty guarantees as they appear in the Virginia constitution and statute and in the Illinois bill of rights, either the one for freedom of religious profession, worship and opinion, or the one for freedom from civil and political disabilities on account of religion, or the one for freedom from taxation to help support any church establishment, ever had any serious application or force as limitations on the power of the legislature to provide public schools and prescribe the public school curriculum." In regard to the objection that the King James version of the Bible is opposed to the Roman Catholic belief, he says: "The answer is, the objection only shows, at the most, that the King James Bible is non-Roman Catholic, not that it is, of itself and necessarily in a constitutional sense, anti-Roman Catholic." In regard to the objection on the part of those of the Jewish faith, he says: "The case of a Jew complaining to a court of reading the Bible or instruction in the Christian religion in the public schools raises the question whether the constitution vests in a Jew, not as a Jew, but as a taxpayer, a constitutional right to command  .  .  courts to exclude reading the Bible or instruction in the Christian religion from the public-school curriculum altogether, merely because it is the Bible or the Christian religion. The answer is, the constitution does nothing

of the kind. The Jew may complain to a court as a taxpayer just exactly when, and only when, a Christian may complain to a court as a taxpayer, i e., when the legislature authorizes such reading of the Bible or such instruction in the Christian religion in the public schools as gives one Christian sect a preference over others." The analysis clearly shows the unsoundness of the conclusion reached by the majority of the court in that case, and the absence of authority to sustain it.

The weight of authority among American courts is in accord with the view taken by this court in the case of *Trustees of First Methodist Church* v. *City of Atlanta, 76 Ga.* 181, to the general effect that the constitutional provisions like article 1, section 1, par. 14, of the constitution of Georgia, were intended to forbid the levy of direct taxation to support the establishment of a State religion, or to forbid any preference or discrimination between religious sects or creeds. The reading of the Scriptures in the public schools does not convert the school into a sectarian institution. The case of *First Methodist Church* v. *Atlanta,* supra, was subsequently reviewed and overruled, but there was no modification or change in the construction given to the meaning of art. 1, section 1, par. 14, of the Georgia constitution. *City of Atlanta* v. *First Presbyterian Church, 86 Ga.* 730 (13 S. E. 252, 12 L. R. A. 852). Courts are not concerned with the wisdom of legislation. It it the duty of the court to decide in a proper case whether legislation is in conflict with the constitution; but in all cases the conflict must be clear and manifest before the court will declare the same void. All doubts must be resolved in favor of the constitutionality, certainly with regard to the constitution of this State. Construing paragraph 14 of article 1, section 1, in connection with paragraphs 12 and 13 of the same article of the constitution of Georgia, as we do, in harmony with the previous expression of this court and with the weight of authority throughout the American Union, we hold that the ordinance of the City of Rome requiring the board of education to have, through the principals and others, the reading of extracts from the Bible and prayers in the public schools of Rome, is not in conflict with the constitution of this State for any reason assigned.

2. The act of the General Assembly approved August 19, 1918 (Acts 1918, p. 813 to 885), providing a new charter for the City

of Rome and establishing government by city commissioners, in section 83 provided for the establishment of a system of public schools, and further, that "the said commission is empowered to maintain and is authorized and empowered to provide by ordinance, in their discretion, for appropriate agencies to regulate, supervise, and carry on said system of public schools and to render same efficient." In section 84 it provided that a board of education to consist of five members "be and the same is hereby established." In section 86 it was provided that said board of education and the individual members thereof shall be amenable to the said city commission, and may be removed from office upon trial and conviction, and that the city commission shall elect the successor of the member or members so removed. In section 87 it was provided that the board of education "shall have supervision and control over said system of public schools in accordance with the provisions of this charter and the ordinances of said city." Section 92 of the act provides that it shall be the duty of the board of education to make reports to the city commission, at such times as they may be called upon to do so, of all matters pertaining to said public schools; and further provides that all books, papers, bills and vouchers of the board shall at all times be open to inspection and examination by the commission or such other agency as they may employ for that purpose. Section 93 provides for a board of visitors for the public schools, and provides that such board of visitors shall make a report to the city commission and the board of education of their work, with such recommendations as they may deem proper concerning the further management of the schools; and section 94 provides "that the said city commission are authorized and empowered to pass such further ordinances and resolutions, not in conflict with this Act, as they may deem for the best interest of said public schools, and further define the duties of said board of education." All of the sections of the charter of the City of Rome relating to the public-school system must be construed together; and thus construed, we think it is clear that it was the intention of the General Assembly to make the board of education amenable to the city commission as expressed by ordinance in all matters not contrary to the charter of the City of Rome or the laws and constitution of this State. As we view the provisions of the charter, we find no conflict between the

provision in section 87 to the effect that the board of education shall have supervision and control over the public schools in accordance with the provisions of the charter and the ordinances of the city, and the other provisions of the charter establishing the board of education; therefore we think the contention made by the plaintiffs in error, that under the terms of the charter of the City of Rome the board of education have authority, without interference from the commission of the city, to prescribe and put into effect the course of instructions, and that the ordinance is an usurpation of their privileges and duties in this respect, is without merit. While the board of education is an important agency of the municipal government and invested with wide discretion and power, it is not independent of the municipal government, but is made subject to and dependent upon the municipal government in all respects within the lawful powers of the latter as above expressed.

3. Mandamus is the proper remedy to require the board of education of the City of Rome to perform the duty imposed by law, where it is the only adequate and specific remedy at law. *Mattox v. Board of Education,* 148 Ga. 577, 581 (97 S. E. 532, 5 A. L. R. 568). In the present case it is the only adequate, specific, and complete remedy to enforce the terms of the city ordinance in question. Section 86 of the charter of the city, empowering the commissioners to remove the board of education, is not adequate and complete, since the successors of the officers removed would have it in their power to also refuse compliance, and so would their successors, and so on ad infinitum, thus bringing about delay and no certainty as to bringing about obedience to the terms of the ordinance. While courts will not undertake to control the exercise of matters entrusted to the discretion of public-school officers, nor to compel such officers to do in a specified manner any act which involves discretion and judgment, mandamus will issue to command said officers to act or to set them in motion. *Richmond County v. Steed,* 150 Ga. 229 (103 S. E. 253).

*Judgment affirmed. All the Justices concur, except Beck, P. J., and Hines, J., who dissent.*

BECK, P. J., dissents from the judgment in this case on the ground that the court will not undertake, by writ of mandamus

and proceedings ancillary thereto, to compel the observance of the ordinance in question.

HINES, J., dissenting. I dissent from the opinion of the majority in this case. I do so with considerable misgiving, as I am without the aid and comfort of a single one of my associates; but, being committed with my whole soul to the doctrine of religious freedom, including freedom from molestation in matters of conscience, I feel in duty bound to give vent to my inability to agree to the conclusion reached by my able associates.

The ordinance of the City of Rome provides that " the Board of Education shall require some portion of the King James version of the Bible, of either the Old or New Testaments, to be read and prayer offered to God in the hearing of the pupils of the Public Schools of the City of Rome daily during the regular sessions of these schools; . . that these readings and prayers shall be conducted by the Principals of said schools, or by persons invited by them for such services, and the selections of Scripture to be read shall be made by the persons conducting the readings, and the readings shall be without comment." This ordinance further provides that " exemption from attendance on these readings and prayers shall be granted to any pupil or pupils whose parents or guardians shall present to the Superintendent of the Schools request in writing for such exemption upon the ground of conscientious objections."

This ordinance is attacked on the ground that it conflicts with these provisions of the State constitution: (*a*) " All men have the natural and inalienable right to worship God, each according to the dictates of his own conscience, and no human authority should in any case control or interfere with such right of conscience." (*b*) " No inhabitant of this State shall be molested in person or property, or prohibited from holding any public office or trust, on account of his religious opinions; but the right of liberty of conscience shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace and safety of the State." (*c*) " No money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religionists, or of any sectarian institution."

This ordinance violates the rights secured by all the above constitutional provisions; and therefore is unconstitutional and void.

The first provision declares the natural and inalienable right of the individual to worship God according to the dictates of his own conscience; and guarantees and safeguards this sacred right of conscience by declaring that no human authority, not even the board of commissioners of the City of Rome, shall in any case control or interfere with such right of conscience. Yet this ordinance provides a system of worshipping God, consisting of reading the King James Version of the Scriptures and prayers, and names the principals of the Rome schools, or the persons selected by them, as the ministers of the system. This ordinance establishes a system of worship for the schools of Rome, and thus in this case controls or interferes with the individual worship of God. Roger Williams said: "No one should be bound to worship, or to maintain a worship against his own consent." Religious freedom includes the right not to worship God at all. All the pupils of the Rome public schools, unless their parents or guardians, in writing, request that they be excused, are bound to attend these religious exercises. The unexcused children are bound to attend and listen to this worship. It will not do to say that parents or guardians, having conscientious objections to the Rome system of worship, can exempt their children or wards from attendance thereon, and that this exception saves the constitutionality of this ordinance. The exemption of certain classes from the operation of an unconstitutional enactment will not save its face.

The second provision of the State constitution, above set out, provides that "No inhabitant of this State shall be molested in person or property . . on account of his religious opinions." Does this ordinance conflict with this provision? Is the language, "molested in person," confined to deprivation of personal liberty and to the infliction of stripes or punishment, because of one's religious beliefs? It seems to me that this language has a much broader significance. It treats the person as made up of body, mind, and spirit. To molest is to vex, worry, or disturb. Anything which vexes, worries, or disturbs a person in body, mind, or soul falls within the meaning of this language.

The religious opinions of the Catholics proscribe the King James version of the Scriptures. The beliefs of the Jews condemn the teachings of the New Testament, which constitutes a part of this version of the Bible. Various branches of the Protestant

Church base their peculiar tenets upon certain texts of the New Testament found in this version. The reading of this version offends and molests the Catholics and the Jews. The reading of certain texts of this version will molest certain sects of Protestants. The system of worship provided for in this ordinance will offend the deists, atheists, and agnostics. This molestation of these various sects will or may come from the enforcement of this ordinance, and on account of their religious beliefs; and falls within the condemnation of this provision of our State constitution. Parents and guardians who may be deists, atheists, or agnostics, and even Christians with strong convictions, may be loath to disclose their objection to this worship, for fear they might be subjected to criticism, if they were to request in writing that their children or wards be excused from attendance.

Finally, this ordinance falls within the spirit, if not within the letter, of the provision of our State constitution which declares that "No public money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect, or denomination of religionists, or of any sectarian institution." We can not disguise the fact that making the reading of the King James version of the Bible a part of the worship of the public schools puts municipal approval upon that version, and thus discriminates in favor of and aids the Protestant sects of the Christian religion. So the selection of the Douay Bible would put the stamp of municipal approval on it; and thus discriminate in favor of and aid the Catholics. The public schools are supported by taxation. Members of all denominations of religionists contribute to the funds by which they are supported. No public funds can be lawfully taken from the public treasury and used in any manner which aids any sect or denomination. The use of such funds, in running public schools, in which a curriculum exists and which aids any sect, is forbidden by this provision.

I recognize the perils of the public schools to morals and religion, due to the lack of moral instruction; and the importance of supplying the teaching of morals and religion. Yet this must be accomplished by methods which keep the State and Church separate, which protect the natural and inalienable right of any individual to worship, or not to worship, God according to the dictates of his own conscience, and under which no aid is given to any sect or denomination.